Filed 6/20/24

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| CAILIN HARDELL,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>ADRIAN VANZYL,<br><br>        Defendant and Respondent. | A168113<br><br>(City & County of San Francisco<br>Super. Ct. No. CGC22602112) |

Cailin Hardell appeals from the trial court's order granting Adrian Vanzyl's motion to quash. Hardell sued Vanzyl, along with Waleed Mohsen and Blumberg Capital, for sexual assault and battery, sexual harassment, and retaliation, among other claims, relating to an incident in Miami, Florida in March 2022. Vanzyl moved to quash service of summons of the first amended complaint, arguing that, as a non-resident defendant, he had insufficient contacts with California for the trial court to exercise either specific or general personal jurisdiction over him. The trial court agreed, and also denied Hardell's request to conduct jurisdictional discovery.

On appeal, Hardell argues that the trial court erred in finding that Vanzyl was not domiciled or continuously and systematically present in California in March 2022, and otherwise that Vanzyl had insufficient suit-related contacts with California. She also argues that the court should have granted her request for jurisdictional discovery. We conclude that the connection between Hardell's claims against Vanzyl and his contacts with California is too attenuated to support specific jurisdiction. We also conclude,

however, that the trial court erred in failing to consider whether it could exercise general jurisdiction over Vanzyl notwithstanding its finding that he was not domiciled in California in March 2022, and that it abused its discretion in denying Hardell's request for discovery. On remand, Hardell must be allowed to conduct limited discovery addressing whether the trial court may exercise general jurisdiction over Vanzyl.

## BACKGROUND

### I. Factual History

In 2019, Hardell founded Segmed, Inc., a medical data company, with three other Stanford alumni. Hardell became Segmed's CEO and worked and resided in California until roughly March 2020, when she traveled to Colorado and remained as a resident.

Vanzyl was a Blumberg senior director. Blumberg is a venture capital firm that invests in privately held portfolio companies, and Mohsen was and is the CEO of two companies in which Blumberg invested. Blumberg and Segmed are headquartered in California and both companies operate from California.

In October 2020, Blumberg invested in Segmed. Pursuant to the investment agreement, Blumberg appointed Vanzyl to Segmed's board of directors. Starting in summer 2021, Vanzyl directed Hardell to raise more funds for Segmed. He also assisted Hardell in her fundraising efforts, including with respect to a particular venture capital firm, dubbed "VC Firm A" in Hardell's complaint. In January 2022, Vanzyl took Hardell to lunch in San Francisco, where he explained that "he was essential to Hardell's and Segmed's continued success," and that if Blumberg expressed support for Segmed, other investors were more likely to invest in the company. In February 2022, Hardell met with representatives from

2

VC Firm A, who tentatively suggested a large investment, subject to further discussion with Vanzyl.

From March 6 to 9, 2022, Hardell attended a business conference in Miami, Florida as part of her fundraising efforts for Segmed. Hardell alleges that, while there, she attended a March 8 dinner with Vanzyl, Mohsen, and the CEO of another Blumberg portfolio company. At the dinner, Vanzyl and Mohsen encouraged her to drink alcohol. The two men then accompanied her, uninvited, to a second event where she met with potential investors. They again served her alcohol. Afterward, they purchased more alcohol at a liquor store, and Hardell alleges that Vanzyl directed them to the beach. "Hardell protested, asking about Vanzyl's wife and kids." Nevertheless, they proceeded to the beach, drinking on the way. Vanzyl and Mohsen went skinny-dipping. Hardell also swam but kept her undergarments on.

Back on shore, Vanzyl and Mohsen encouraged Hardell to drink more. The three discussed work. Vanzyl had previously expressed support for VC Firm A's investment in Segmed, but on the beach he became "purposefully non-committal." He steered the conversation to the topic of sex. He asked Hardell about her sex life. He then told her he loved her and kissed her.

Vanzyl performed oral sex on Hardell and encouraged Mohsen to do the same. They continued even though she repeatedly told them to stop. Hardell then got dressed and the three went to a bar, where Mohsen asked his roommate to vacate their hotel room. Hardell protested and explained that she was scared of Vanzyl and Mohsen due to the power dynamic at play. Vanzyl responded with "a 'safe word.'" The men handed her two shots of tequila and told her to drink them and then "took Hardell to Mohsen's hotel room and continued the assault."

3

At 5:30 a.m. on March 9, Vanzyl told Hardell "he had to get home to his wife." Hardell walked to her hotel room and called a rape hotline. A medical examination revealed that she had suffered physical injuries. Hardell also experienced severe emotional distress and was not able to return to work as Segmed's CEO. After she reported the incident, Hardell alleged, Blumberg retaliated against her, causing her eventually to relinquish her role in the promising startup that she had co-founded and directed.

## II.    The Lawsuit and Motion to Quash

Hardell sued Vanzyl, Mohsen, and Blumberg on September 30, 2022, asserting claims of retaliation, unlawful conduct under Government Code section 12964.5, sexual assault and battery, gender violence, harassment, and intentional infliction of emotional distress. She named Vanzyl as a defendant on the latter four claims.

Vanzyl lived in Australia when Hardell filed suit. She served him with the summons and complaint on March 25, 2023. He moved to quash service, arguing that the trial court lacked personal jurisdiction over him. He averred in his declaration in support of the motion that he was not a California resident in March 2022, having permanently relocated from California to Florida in February 2022. When he moved to Florida, and then to Australia, he "had no intention of moving back to California to either live or work." He sold his house in California and purchased one in Miami, where his daughter was enrolled in a new school. His paystubs identified Florida as his residence for tax purposes in the latter half of February 2022. Vanzyl denied that he owned real property in Tahoe, California, and stated that he did not have any interaction with Hardell in California after moving to Florida. He worked for Blumberg in Florida, not California, in March 2022, and he did not operate any business in California in March 2022. Vanzyl asserted that he did not

4

direct Hardell to attend the conference in Florida, but that she emailed him and asked about it. He also denied directing Hardell to attend the March 8 dinner and attached email correspondence showing that Mohsen invited Vanzyl and Hardell to the dinner. At the time of the invitation, Vanzyl averred, he "had already moved to, and was working in, Florida."

Vanzyl's realtor also submitted a declaration. The realtor helped Vanzyl search for a home in late 2021 and early 2022. The sale of the Florida home closed in February 2022. During her "regular" visits in February and March 2022, she "observed that both Mr. Vanzyl and his wife had moved their belongings into the house, had decorated the house, and appeared to be fully moved into and living in the house."

In opposition to the motion to quash, Hardell argued that Vanzyl's declaration was not credible. She provided evidence to rebut his claims of domicile, including that court filings in another case referenced a "Vanzyl family vacation home" in Tahoe, California. While interacting remotely, Hardell had observed Vanzyl work from his study in the Tahoe home. Vanzyl told Hardell in January 2022 that the Tahoe home was his "home base," the place to which "he and his family would consistently return," and the place where the family kept their important belongings. Mail addressed to Vanzyl was forwarded or sent directly to the Tahoe home. In 2021, Vanzyl's son worked remotely as a Segmed intern from the Tahoe home. In filings in the trial court, Vanzyl stated that his parents owned the Tahoe home.

After Hardell moved to Colorado in March 2020, she communicated with Segmed employees and directors in California and at times worked from California. In January 2022, Hardell and Vanzyl communicated by chat about matters related to Segmed while both were in California. At a lunch in

5

San Francisco the same month, Vanzyl told Hardell he was leaving San Francisco for Miami.

A private investigator working for Hardell also submitted a declaration. According to the declaration, Vanzyl owned and operated at least one California business, Target Velocity Companies LLC (Target Velocity), in 2020 and 2021. The California Secretary of State's business database showed in 2023 that Vanzyl was Target Velocity's agent for service of process, with a San Francisco address. According to Blumberg's discovery responses, Vanzyl's contact email, which appeared active, had "@targetvelocity.com" as a domain name and in 2023 Vanzyl answered a telephone call to a number with a San Francisco area code attributed to Target Velocity. In 2022 and 2023, Vanzyl also represented himself on LinkedIn and Twitter as a San Francisco-based investor. His LinkedIn profile indicated that he had been working for Blumberg in San Francisco since October 2020, had been working from the San Francisco Bay Area, in addition to Singapore and Thailand, since 2019, and had previously worked for Blumberg in the San Francisco Bay Area from 2001 to 2011.

In 2022, Vanzyl also owned two residential properties in San Francisco. Vanzyl sold his Noe Valley property on or around February 15, 2022. Vanzyl co-owned his Potrero Hill property with Target Velocity, but sold the property on July 30, 2022. Vanzyl purchased the Miami home through a company; the mailing address for the company was the address of the Tahoe home. Mail sent to Vanzyl at the Miami address was returned with the Tahoe home listed as the forwarding address. As of December 2022, Vanzyl was renting out the Miami home through Airbnb.

After considering the parties' submissions on the motion to quash, the trial court found that Hardell had not proven that it could exercise either

6

specific or general jurisdiction over Vanzyl, stating as to the latter that Vanzyl was not domiciled in California as of March 2022. The court also declined to grant Hardell's request for jurisdictional discovery, because although Hardell had employed private investigators and "had the means to gather evidence to satisfy [her] burden," she could not do so.

**DISCUSSION**

## I. Standard of Review

"When a nonresident defendant challenges personal jurisdiction, the plaintiff bears the burden of proof by a preponderance of the evidence to demonstrate the defendant has sufficient minimum contacts with the forum state to justify jurisdiction." (*Thomson v. Anderson* (2003) 113 Cal.App.4th 258, 266 (*Thomson*).) California's long-arm statute, Code of Civil Procedure section 410.10, makes California courts' authority to exercise jurisdiction over a defendant coextensive with federal and state constitutional limitations. (*Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 444, overruled on other grounds by *Bristol-Myers Squibb Co. v. Superior Court* (2017) 582 U.S. 255, 264 (*Bristol-Myers Squibb*).)

This court reviews for substantial evidence disputed facts underlying an order granting a motion to quash for lack of jurisdiction. (*Thomson, supra,* 113 Cal.App.4th at pp. 266–267.) We review de novo the overarching question whether the exercise of jurisdiction over defendant "is fair and reasonable" based on those facts. (*Aquila, Inc. v. Superior Court* (2007) 148 Cal.App.4th 556, 568; *SK Trading Internat. Co. Ltd. v. Superior Court* (2022) 77 Cal.App.5th 378, 387, 392 (*SK Trading).*) We review for abuse of discretion the denial of Hardell's request for jurisdictional discovery. (*Goehring v. Superior Court* (1998) 62 Cal.App.4th 894, 911.)

7

## II. Potential Mootness of Motion to Quash

Hardell filed a second amended complaint while the motion to quash was pending. No party has contended that the filing of the second amended complaint mooted the motion to quash, but we may consider the possibility of mootness on our own motion. (*City of Hollister v. Monterey Ins. Co.* (2008) 165 Cal.App.4th 455, 479.) "Because there is but one complaint in a civil action [citation], the filing of an amended complaint moots a motion directed to a prior complaint." (*State Compensation Ins. Fund v. Superior Court* (2010) 184 Cal.App.4th 1124, 1131.) At least one court has suggested in dicta that a motion to quash is encompassed by this rule. (See *Naylor v. Superior Court* (2015) 236 Cal.App.4th Supp. 1, 4.) However, a motion to quash is directed to the summons, and the filing of an amended complaint does not require the issuance of a new summons when the parties remain the same. (*Gillette v. Burbank Community Hosp.* (1976) 56 Cal.App.3d 430, 433.) Accordingly, the filing of an amended complaint does not *necessarily* moot a motion to quash service of summons when no new summons is required.

We recognize, however, that there may be circumstances in which the filing of an amended complaint would moot a pending motion to quash. For example, because the existence of specific jurisdiction is tied to the claims asserted, if the amended pleading advanced different claims or identified additional underlying facts, it could moot a jurisdictional analysis based on the allegations of the prior pleading. (See *Mihlon v. Superior Court* (1985) 169 Cal.App.3d 703, 710 [the pleading "defines the cause of action, the nature of which has some bearing upon the decision whether it is fair and reasonable to require the nonresident parties to appear and defend in this state"].) Here, however, the parties do not contend that there are differences between the allegations of the first and second amended complaints that would affect any

8

aspect of the jurisdictional analysis, and we do not discern any material differences in our own review of the two pleadings.  We therefore turn to the merits of the parties' arguments.

## III.   Specific Jurisdiction

Hardell argues that the trial court should have found Vanzyl's conduct in California gave rise to specific jurisdiction here, even though the assault and battery occurred in Florida.  In California, Hardell contends, Vanzyl groomed her for the Florida assault; established the power dynamic essential to the assault; and directed her to attend the conference in Florida.  Vanzyl's California conduct, Hardell says, was therefore part of a "*continuum . . . that culminated* in March 2022, when Vanzyl plied Hardell with drinks . . . and sexually harassed and assaulted her."

To determine whether specific jurisdiction exists, we look for the " 'relationship among the defendant, the forum, and the litigation.' " (*Ford Motor Co. v. Montana Eighth Judicial Dist. Court* (2021) 592 U.S. 351, 365 (*Ford Motor Co.*).)  "A court 'may exercise specific jurisdiction over a nonresident defendant only if (1) "the defendant has purposefully availed himself or herself of forum benefits" [citation]; (2) "the 'controversy is related to or "arises out of" [the] defendant's contacts with the forum' " [citations]; and (3) " ' "the assertion of personal jurisdiction would comport with 'fair play and substantial justice.' " ' " (*SK Trading*, *supra*, 77 Cal.App.5th at p. 387.)

We focus on the second, "relatedness" prong of the specific jurisdiction analysis, because it lies at the crux of the parties' dispute and is determinative.  Recently, the United States Supreme Court clarified that a strict causal connection between the plaintiff's claims and the defendant's contacts with the forum state is not required.  (See *Ford Motor Co.*, *supra*, 592 U.S. at pp. 361–362 [jurisdiction may lie where defendant's contacts with

9

the forum "relate to" plaintiff's claims, even without a direct causal connection, but such a relation has "real limits"].) Hardell has not, however, identified any case where specific jurisdiction was founded on a causal connection as attenuated as that here. (Cf. *LG Chem, Ltd. v. Superior Court* (2022) 80 Cal.App.5th 348, 369–370, 374 [lack of connection between claims against defendant and defendant's admitted in-state contacts]; *Rivelli v. Hemm* (2021) 67 Cal.App.5th 380, 406–408 [no specific jurisdiction without evidence that individual director of company directed tortious conduct or wrongdoing at forum]; *Jacqueline B. v. Rawls Law Group, P.C.* (2021) 68 Cal.App.5th 243, 258–259 [no specific jurisdiction to hear legal malpractice claim where no alleged malpractice arose from California conduct and the only in-state contact was in underlying lawsuit]; *Halyard Health, Inc. v. Kimberly-Clark Corp.* (2019) 43 Cal.App.5th 1062, 1072 [rejecting "causal chain" theory to establish relatedness].)

Hardell argues that the relationship between her claims and Vanzyl's contacts is greater than those in which courts have found a lack of specific jurisdiction, pointing to *David L. v. Superior Court* (2018) 29 Cal.App.5th 359, 366 (*David L.*) and *Bristol-Myers Squibb*, *supra*, 582 U.S. at page 264. In both cases, the courts found an absolute lack of connection between the defendants' contacts with the forum, if any, and the plaintiffs' claims. But those cases do not mean that any greater connection is sufficient to establish specific jurisdiction. Hardell also relies on *Integral Development Corp. v. Weissenbach* (2002) 99 Cal.App.4th 576. In that case, the defendant obtained confidential business information as a direct result of his employment relationship with the plaintiff, a California company, and later its wholly-owned German subsidiary. (*Id.* at p. 587.) The court concluded that the California company's claims of misappropriation of trade secrets and unfair

10

competition were "directly related to [defendant]'s contacts with [California] in that they arise from the employment relationship." (*Ibid.*) The court also found that the defendant aimed his tortious conduct at the California plaintiff, and therefore satisfied the "effects test" of personal jurisdiction. (*Id.* at p. 588.) By contrast, Hardell was a resident of Colorado, not California, even though she had ongoing work in this state. And although Hardell relies on *Weissenbach* assertedly to show the court erred with respect to its analysis of evidentiary matters, we see no material dispute of the evidentiary facts informing our specific jurisdiction analysis; the connection between the employment relationship at issue in *Weissenbach* and the alleged torts is much closer than the asserted relationship here.

Hardell further asserts in her reply brief that her sexual harassment claim is based on the parties' employment relationship—that it "played a key role in [Vanzyl's] ability to direct her to attend an out-of-state conference, join her for a business-related dinner there, ply her with drinks, and overcome her objections to his sexual harassment." But the causes of action Hardell alleged against Vanzyl—including the harassment claim—are based on the discrete events that occurred from March 8 to 9, 2022. Vanzyl's asserted conditioning of a benefit on sexual favors occurred on the beach in Florida. The earlier contacts in California may well have set the stage for the alleged power dynamic that facilitated the events in Florida, as Hardell argues, citing *Minarksy v. Susquehanna County* (3d Cir. 2018) 895 F.3d 303, 314, *Vance v. Ball State Univ.* (2013) 570 U.S. 421, 458 (dis. opn. of Ginsburg, J.), and *Henson v. City of Dundee* (11th Cir. 1982) 682 F.2d 897, 910. But a business-related power imbalance may exist innocuously and indefinitely. It does not, without more, establish a sexual harassment claim, and there is no allegation that Vanzyl made sexual overtures to Hardell, or even planned

11

them, anywhere other than in Florida. Although Hardell uses the word "grooming" in her briefing, there are no allegations in the complaint that, while in California, Vanzyl cultivated a relationship with her with the intent of later making sexual advances or committing a sexual assault. Vanzyl submitted undisputed evidence that it was Hardell who first raised the Miami conference by email in February 2023—after their January lunch in San Francisco—and that the dinner preceding the assault was proposed by Mohsen when Vanzyl had already moved to Florida.[1] On these facts, Hardell has not shown the requisite connection between Vanzyl, California, and any of her claims against him.

## IV. General Jurisdiction

Hardell also argues that the trial court had general jurisdiction over Vanzyl because he was domiciled in California at the time of the assault and because his contacts with California otherwise establish that he was "essentially at home" here. "A court with general jurisdiction may hear *any* claim against that defendant, even if all the incidents underlying the claim occurred in a different state." (*Bristol-Myers Squibb*, *supra*, 582 U.S. at p. 262.) " 'For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile . . . ,' " (*ibid.*), but a court may also exercise general jurisdiction over a nonresident defendant where the defendant's presence in the forum is " 'so "continuous and systematic" ' " that

---

[1] While Hardell acknowledged in her opposition to the motion to quash that she was the one who brought the Miami conference to Vanzyl's attention, she added that Vanzyl "told me I should go." Vanzyl stated in his declaration that he "did not propose or direct" that Hardell attend the conference. To the extent these declarations can be read to create a factual dispute, the resolution of that dispute is not essential given the absence of any allegation that Vanzyl, while in California, told Hardell to attend the conference intending that it would furnish the occasion for a sexual assault.

the defendant is " 'essentially at home' " there.  (*Daimler AG v. Bauman* (2014) 571 U.S. 117, 137, 139, fn. 19; see *David L.*, *supra*, 29 Cal.App.5th at p. 366 [defendant's contacts with the forum must be " 'so wide-ranging that they take the place of physical presence in the forum' "].)

The trial court concluded that general jurisdiction was lacking based on its finding that Vanzyl was domiciled in Florida in March 2022.  While we conclude that Vanzyl's declaration constituted substantial evidence in support of this finding, his domicile does not necessarily end the inquiry.  While it may be the "exceptional" case in which the facts would warrant the exercise of general jurisdiction over an individual who is domiciled elsewhere (cf. *Daimler AG v. Bauman, supra*, 571 U.S. at p. 139, fn. 19 [discussing corporations]), the "essentially at home" standard leaves open the possibility.  (See *Fernandez v. Tox Corporation* (C.D. Cal. 2023) 677 F.Supp.3d 1089, 1102.)

Here, there appears to be no dispute that Vanzyl had a continuous and systematic presence in California as late as February 2022; it was his domicile and he had worked in the state at least since 2019.  While in March he changed his domicile to Florida and apparently later to Australia, there is evidence indicating that California remained an important locus of his professional and personal activities.  For example, Vanzyl's social media profiles through May 2023 describe him as a San Francisco-based investor.  He continued to own Target Velocity, a San Francisco-based company, in 2023.  In March 2023, he answered a telephone number with a San Francisco area code attributed to Target Velocity, and he had an email address with "targetvelocity.com" as the domain name.  When he lived in San Francisco, Vanzyl and his family spent significant time at a house in Lake Tahoe apparently owned directly or indirectly by his parents and that

Vanzyl described to Hardell as his "home base."  The record is unclear about whether he would have considered himself at home there after he moved to Florida, but at least some of his mail was sent and/or forwarded to the Tahoe home between January and May 2023, including mail addressed to the Florida home.  Under the circumstances, we believe the trial court should have considered whether the nature and quality of Vanzyl's continued contacts with California rendered him subject to general jurisdiction here notwithstanding that he was domiciled elsewhere.[2]

To answer that question, we think the trial court should assess the nature of Vanzyl's continuing contacts with California as of the lawsuit's filing through the time that service was effectuated.  Admittedly, the case law on the question is not settled, with some courts also pointing to the time of the events giving rise to suit.  (See, e.g., *DVI, Inc. v. Superior Court* (2002) 104 Cal.App.4th 1080, 1100 (*DVI*) ["In analyzing general jurisdiction, we examine the defendant's contacts when the alleged conduct occurred and at the time of service of summons"]; *Strasner v. Touchstone Wireless Repair & Logistics, LP* (2016) 5 Cal.App.5th 215, 222 [citing *DVI* for the same proposition without additional analysis]; *Pecoraro v. Sky Ranch for Boys, Inc.* (8th Cir. 2003) 340 F.3d 558, 562 ["Minimum contacts must exist either at the time the cause of action arose, the time the suit is filed, or within a reasonable period of time immediately prior to the filing of the lawsuit"];

---

[2] In the trial court, Vanzyl objected to some of the evidence discussed above, including his social media profiles, information about Target Velocity or other companies reflected in corporate filings, and Hardell's observations of Vanzyl and his son working from the Tahoe home.  The trial court did not rule directly on those objections but the parties agree we should assume the court overruled them.  We find it unnecessary to adjudicate them, because even if some of the objections were meritorious, the challenged records still furnished a good-faith basis for jurisdictional discovery, as discussed below.

*Boaz v. Boyle & Co.* (1995) 40 Cal.App.4th 700, 717 [court "assume[d]" that the relevant period was the time of the events giving rise to suit rather than just before service].) As a well-known treatise has observed, the United States Supreme Court has not resolved whether the relevant time for analyzing general jurisdiction is the accrual of the claim or the filing of suit. (4 Wright & Miller, Fed. Prac. & Proc. Civ. (2015) § 1067.5, p. 510).)

Most courts that identify the accrual of the claim as either a relevant or the determinative time for assessing jurisdiction, however, cite cases discussing *specific* jurisdiction or otherwise do not consider the distinction. The *DVI* court itself noted that the focus on the time of the events underlying the dispute has arisen in the context of specific jurisdiction. (*DVI, supra*, 104 Cal.App.4th at pp. 1100–1101; see *Steel v. United States* (9th Cir. 1987) 813 F.2d 1545, 1549 ["When a court is exercising specific jurisdiction over a defendant . . . the fair warning that due process requires arises not at the time of the suit, but when the events that gave rise to the suit occurred"].) While specific jurisdiction rests on the defendant's conduct at issue in the litigation, general jurisdiction means that the defendant is subject to the court's jurisdiction even in the *absence* of any connection between the forum and the conduct giving rise to the lawsuit—a consideration that we think makes the time of filing the more relevant measure of the defendant's contacts.

We have previously drawn from *DVI* the conclusion that "general jurisdiction is determined no earlier than at the time a suit is filed," explaining that "a finding of general jurisdiction is essentially a finding that a foreign defendant's contacts with a forum are ' "so wide-ranging that they take the place of physical presence" ' *for purposes of service of process*." (*Young v. Daimler AG* (2014) 228 Cal.App.4th 855, 864, fn. 6, emphasis

15

added.)  As one federal court explained, reaching the same conclusion we do here, "the time the complaint is filed is the time at which the plaintiff urges the court to assert its authority over the defendant."  (*Noonan v. Winston Co.* (1st Cir. 1998) 135 F.3d 85, 95 & fn. 10; see also *Klinghoffer v. S.N.C. Achille Lauro* (2d Cir. 1991) 937 F.2d 44, 52 (*Klinghoffer*).)  In addition, the time of service matters because that is the point at which the court's authority is actually asserted over the defendant.  (See, e.g., *Sabre Intern. Sec v. Torres Advanced Enterprise Sol* (D.D.C. 2014) 60 F.Supp.3d 21, 30; *Brandir International, Inc. v. Cascade Pacific Lumber Co.* (S.D.N.Y. July 14, 1988, No. 84 Civ. 1411 (CSH)) 1988 U.S.Dist.Lexis 7269, at p. *1.)

The above analysis does not mean that Vanzyl's contacts before the complaint was filed and served are irrelevant.  The general jurisdiction inquiry also requires a reasonable "lookback" period, typically of several years, to determine whether the defendant's contacts are in fact continuous and systematic.  (See, e.g., *Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.* (2d Cir. 1996) 84 F.3d 560, 567, 569–570.)  Here, however, there is no dispute that Vanzyl had continuous and systematic contacts with California as of February 2022, so the lookback period extends at most to March 2022; his contacts before that date need not be considered except to the extent they shed light on the nature and quality of the contacts that either persisted or arose once Vanzyl was no longer domiciled here.  (See *Kormylo v. Forever Resorts, LLC* (S.D.Cal. Jan. 6, 2015, No. 13-cv-511 JM (WVG)) 2015 U.S.Dist.Lexis 1630, at p. *28 ["In this case, the court need not look back far, as it is undisputed that Allen was domiciled in California until . . . one month before the initial third-party complaint was filed"].)  We emphasize that it is the extent of those later contacts, rather than his previous contacts when domiciled in California, that will be dispositive.  (See,

16

e.g., *Serafini v. Superior Court* (1998) 68 Cal.App.4th 70, 80; *Klinghoffer, supra*, 937 F.2d at p. 52.)

In our view, the current record raises only the *possibility* that the exercise of general jurisdiction could be warranted. The full nature of Vanzyl's California contacts after he moved to Florida is unclear, and it is possible that they changed again with his later move to Australia. Accordingly, we next consider whether the trial court abused its discretion in failing to grant a continuance that would allow Hardell to take jurisdictional discovery.

## V.    Jurisdictional Discovery

Hardell requested jurisdictional discovery in the trial court, noting generally her right to conduct discovery and stating that she "dispute[d] the facts set forth in Vanzyl's declaration" and that Vanzyl did not "present or address significant facts related to his California contacts or current or past domicile." She repeats her request here. With jurisdictional discovery, Hardell contends, she could access non-public information, in addition to what her private investigator acquired from public sources. This would include evidence to contradict the assertions in Vanzyl's declaration and to reveal information omitted from that declaration—Vanzyl's ownership interest in the Tahoe home, the amount of time he spent at that home, and the extent of his business activities in California, including but not limited to those on behalf of Target Velocity.

"A plaintiff attempting to assert jurisdiction over a nonresident defendant is entitled to an opportunity to conduct discovery of the jurisdictional facts necessary to sustain its burden of proof," and "[i]n order to prevail on a motion for a continuance for jurisdictional discovery, . . . should demonstrate that discovery is likely to lead to the production of evidence of

17

facts establishing jurisdiction." (*In re Automobile Antitrust Cases I & II* (2005) 135 Cal.App.4th 100, 127; see *Goehring v. Superior Court*, *supra*, 62 Cal.App.4th at p. 911 ["A plaintiff is generally entitled to conduct discovery with regard to a jurisdictional issue before a court rules on a motion to quash"].)  Although Vanzyl contends that his declaration answers the relevant jurisdictional questions, we agree with Hardell that exploration of his assertions could reveal facts sufficient to establish general jurisdiction. (See *Orchid Biosciences, Inc. v. St. Louis University* (S.D. Cal. 2001) 198 F.R.D. 670, 673–674 [notwithstanding defendant's assertion that its employee's two declarations answered all of plaintiff's jurisdictional questions, there were still " 'pertinent facts bearing on the question of jurisdiction [that] were controverted,' " including whether the declarations disclosed all of defendant's contacts with California]; cf. *Laub v. U.S. Dept. of Interior* (9th Cir. 2003) 342 F.3d 1080, 1093 [district court abused its discretion in denying discovery related to subject matter jurisdiction, where plaintiffs presented public documents that were insufficient, alone, to establish jurisdiction, but that indicated discovery would reveal more detailed information supporting jurisdiction]; *1880 Corp. v. Superior Court* (1962) 57 Cal.2d 840, 843 ["there is no sound reason why a plaintiff should be deprived of [defendant as the primary] source of information" relating to personal jurisdiction].)

Had we agreed with the trial court's legal conclusion that Vanzyl's domicile was dispositive, we would likely find no abuse of discretion in the court's decision to deny a continuance for discovery.  However, because we have disagreed with that conclusion, we also find that the court should have granted Hardell's request.  (See *Deck v. Developers Investment Co., Inc.* (2023)

18

89 Cal.App.5th 808, 824 ["A trial court's decision is an abuse of discretion if it is based on an error of law"].)[3]

## DISPOSITION

The order is affirmed in part and reversed in part. The case is remanded to the trial court with directions to afford Hardell an opportunity to conduct discovery relevant to the court's general jurisdiction over Vanzyl and thereafter to proceed as necessary to resolve the motion to quash. The parties shall bear their respective costs on appeal.

GOLDMAN, J.

WE CONCUR:

BROWN, P. J.
SMILEY, J. [*]

---

[3] Because we conclude that the trial court erred by improperly limiting the scope of its jurisdictional analysis, we do not consider Vanzyl's remaining arguments.
[*] Judge of the Superior Court of California, Alameda County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

| | |
|---|---|
| Trial Court: | City and County of San Francisco Superior Court |
| Trial Judge: | Honorable Richard B. Ulmer |
| Counsel for Plaintiff and Appellant: | BAKER CURTIS & SCHWARTZ, Christopher D. Baker, Robert A. Dolinko |
| Counsel for Defendant and Respondent: | RUTAN & TUCKER, Brian C. Sinclair |